IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANJIV NAIDU, Administrator d.b.n. of the Estate of RAMARAO NAIDU, Deceased, | CIVIL ACTION |
| **Plaintiff,** | |
| v. | No.  23-cv-3179 |
| PNC BANK, N.A., | |
| **Defendant.** | |

HODGE, J.                                                                 March 25, 2026

**MEMORANDUM**

## I.        INTRODUCTION

Plaintiff Sanjiv Naidu, Administrator of the Estate of Ramarao Naidu ("Decedent"), brings claims against Decedent's former bank, PNC Bank, N.A. ("PNC") for breach of contract and conversion pursuant to Pennsylvania's Uniform Commercial Code ("UCC"), 13 Pa. C.S.A. § 3420. Plaintiff alleges that two of Decedent's former employees acted without Decedent's knowledge to issue a series of checks totaling more than $200,000 from Decedent's checking account with PNC. Plaintiff alleges that PNC failed to monitor Decedent's account and provide timely notice of the fraudulent activity. Now before the Court is PNC's Amended Motion for Summary Judgment (the "Motion"). (ECF No. 36.) For the reasons set forth below, the Court grants PNC's Motion.

## II.       BACKGROUND

### A.        Factual Background[1]

As a threshold matter, the Court notes that Plaintiff failed to appropriately dispute any of the material facts Defendant filed in support of the Motion. While Plaintiff submitted a statement

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

of the material facts which he contends present genuine issues for trial as required under the applicable policies and procedures, he failed to respond to the numbered paragraphs set forth in the PNC's Statement of Undisputed Facts. *See* C.J. Goldberg, Policies & Procedures at 8–9.[2] In accordance with these policies and procedures, the Court accepts all material facts set forth in PNC's statement as admitted because Plaintiff made no effort to contest those facts.

### 1.   Account Agreements Between Decedent and PNC

On April 21, 2015, Decedent opened PNC checking account x7299 ("PNC Account"). (ECF No. 36-1 ¶ 13; ECF No. 38, Ex. E ¶ 12.) When he opened the PNC Account, Decedent signed a binding account agreement with PNC ("Account Agreement"). (*Id.*; ECF No. 29-3.) In 2020, as permitted by the terms of the agreement, PNC amended the Account Agreement, with changes becoming effective and binding on December 13, 2020. (ECF No. 36-1 ¶¶ 15–16; ECF No. 29-4.) Under the Account Agreement, PNC was required to make available or send a monthly statement to Decedent listing all activity relating to the account during the statement period. (ECF No. 29-3 at 8; ECF No. 29-4 at 8.) In accordance with the Account Agreement, PNC sent monthly account statements to 1342 Carolannes Way, West Chester, Pennsylvania 19382-6790, which was the last address designated to Decedent's PNC Account.[3] (*Id.*; ECF No. 36-1 ¶¶ 17, 19, 23.) The Account

---

[2] Summary judgment briefing was completed under the previously assigned Judge, Hon. Mitchell S. Goldberg, C.J., before the matter was reassigned to this Court. The Court therefore refers to C.J. Goldberg's Policies and Procedures that were in effect at that time. C.J. Goldberg Policies & Procedures, Mar. 26, 2025.

[3] Plaintiff's Statement of Undisputed Material Facts ("SUMF") in support of its Response to the Motion states that PNC "alleges that they sent monthly account statements to Decedent in each month from May of 2021 to September of 2021." (ECF No. 38, Ex. E ¶ 14.) PNC disputes any assertion or suggestion that they did not, in fact, send statements and asserts that it did send those statements; and, moreover, asserts that Plaintiff failed to dispute that fact when stated in PNC's SUMF. (ECF No. 39-1 ¶ 14.) Given Plaintiff's failure to appropriately respond to PNC's SUMF in support of the Motion, the Court accepts as admitted the fact that PNC sent monthly account statements to Decedent, as well as all other uncontroverted facts submitted by PNC in support of the Motion.

Agreement provides that PNC "will not be liable for payments made and charged" to the account unless the customer notifies PNC of "an error or other irregularity, including unauthorized payment, within 30 calendar days of the mailing date of the earliest statement describing the charge or deposit." (ECF No. 29-3 at 9.) The amended Account Agreement requires notice of errors or other irregularities "within 30 calendar days of the delivery date." (ECF No. 29-4 at 9.)

### 2. Alleged Fraud Committed by Ms. Zeigler and Ms. King

In or around February of 2021, Decedent had two employees—Micayla Zeigler ("Ms. Zeigler") and Danielle King ("Ms. King")—both of whom Decedent hired to perform administrative duties associated with Decedent's business venture, Global Doctors US LLC ("GDUS"). (ECF No. 29-13 ¶¶ 97–100, 102–04; ECF No. 29-10 at 8; ECF No. 29-11 at 3.) Shortly after she was hired, "[w]ith [Decedent's] permission, Zeigler gathered all of the account information needed to do all of [Decedent's] and GDUS'[s] banking and credit card payments on-line, including user-names and passwords to his personal accounts used to fund the business expenses and user-names and passwords to all of his business accounts, including personal and business credit card accounts." (ECF No. 36-1 ¶ 43a.) After the online banking accounts were enabled, "Zeigler then began to manage the day-to-day finances for [Decedent] on-line."[4] (*Id.* ¶ 43d.) Decedent was aware that Ms. Zeigler and Ms. King were managing his finances online and

---

[4] This characterization of Ms. Zeigler's role in managing Decedent's finances appears in Decedent's filings in the Pennsylvania Court of Common Pleas, which is attached to Defendant's initial Motion for Summary Judgment as Exhibit J (ECF No. 29-13) and is referenced extensively in Defendant's initial and amended SUMF (ECF No. 29-1; ECF No. 36-1). In Plaintiff's Opposition to the Motion, Plaintiff asserts that "there is a material factual dispute as to whether Decedent 'delegated management of his personal finances' to Zeigler and King." (ECF No. 38 at 21.) However, as noted above, Plaintiff failed to dispute any of Defendant's statements of undisputed material fact in the manner required by this Court. The Court therefore accepts as admitted the fact that, after enabling online access, Zeigler began to manage Decedent's day-to-day finances online.

he personally was not involved in the online management of his finances, including the management of his PNC Account. (ECF No. 29-2 at 49:9–50:23.) Ms. Zeigler and Ms. King also had access to Decedent's physical checkbooks in his home. (*Id.* at 51:5–11.)

Unbeknownst to Decedent, between April 20, 2021, and August 20, 2021, Ms. Zeigler forged Decedent's signature on seven paper checks and used Decedent's online banking account to issue two electronic checks (the "Forged Checks"). (ECF No. 36-1 ¶¶ 47–49; ECF No. 1 at 14.) On May 13, 2021, paper Check Nos. 597 ($5,000) and 598 ($5,000) were paid to Ms. King and Ms. Zeigler, respectively. (ECF No. 36-1 ¶ 33.) The payment appeared on Decedent's PNC Account statement for April 20, 2021 to May 19, 2021 ("May Account Statement"). (*Id.*; ECF No. 29-5 at 2.) On May 20, 2021, electronic Check No. 7004 ($26,465.73) was paid to Ms. King's Sallie Mae student loan account and electronic Check No. 7005 ($23,520.69) was paid to Ms. Zeigler's Sallie Mae student loan account. (ECF No. 36-1 ¶ 33; ECF No. 36-2 at 14:3–7.) Both payments were reflected on Decedent's PNC Account statement for May 20, 2021 to June 17, 2021 ("June Account Statement"). (*Id.*; ECF No. 29-6 at 2.) On June 1, 2021, paper Check No. 546 ($39,000) was paid to Ms. Zeigler. (*Id.*) This payment appeared on the June Account Statement. On June 14, 2021, paper Check Nos. 521 ($20,000) and 522 ($30,000) were paid to Ms. King and Ms. Zeigler, respectively. (*Id.*) These payments also appeared on the June Account Statement. (*Id.*) On August 1, 2021, paper Check No. 524 ($26,725) was paid to Ms. Zeigler. (ECF No. 36-1 ¶ 33.) The payment appeared on Decedent's PNC Account statement for July 21, 2021 to August 18, 2021 ("August Account Statement"). (*Id.*; ECF No. 29-8 at 2.) Finally, on August 24, 2021, paper Check No. 527 ($29,000) was paid to the West Chester University Foundation. (ECF No. 36-1 ¶ 33.) The payment appeared on Decedent's PNC Account statement for August 19, 2021 to September 20, 2021 ("September Account Statement"). (*Id.*; ECF No. 29-9 at 2.)

Decedent did not review any of the account statements issued between May 2021 and September 2021 until late August 2021 at the earliest. (ECF No. 36-1 ¶¶ 44–45, 52; ECF No. 29-10 at 8–9; ECF No. 29-11 at 3.)

In total, $204,711.42 was dispensed from Decedent's PNC Account via checks made payable to Ms. Zeigler, Ms. King, Sallie Mae, and West Chester University Foundation. (ECF No. 36-1 ¶¶ 30, 33; ECF No. 38, Ex. E ¶ 18.)

### 3.      Decedent's Discovery of the Fraudulent Checks

In August of 2021, Decedent grew suspicious about his PNC Account activity due to several bounced checks and Ms. Zeigler's withholding of Decedent's online login information. (ECF No. 36-1 ¶¶ 50–51; ECF No. 38 at 1.) In late August 2021, Decedent reviewed his PNC Account statements and determined that significant sums were missing from his account and there were various charges that he had not personally approved. (ECF No. 29-10 at 8–9; ECF No. 29-11 at 3; ECF No. 29-13 at 17.) On August 24, 2021, Decedent intimated to Ms. King that he was aware Ms. Zeigler was stealing from him. (ECF No. 36-2 at 19:24–20:23, 26:4–9.) On September 13, 2021, Decedent went to the PNC Bank branch in West Chester, Pennsylvania and requested that PNC print the Forged Checks for his review. (ECF No. 36-1 ¶ 53; ECF No. 29-2 at 64:14–65:8.) After his review that day, Decedent notified the staff at PNC that he had not signed or approved the Forged Checks. (ECF No. 36-1 ¶ 55; ECF No. 38, Ex. E ¶ 19; ECF No. 29-2 at 65:1–6.) On October 7, 2021, Decedent's attorney submitted a "Forged Check Affidavit" to PNC and requested that the identified checks be forwarded to PNC's fraud department. (ECF No. 36-1 ¶ 56; ECF No. 29-12.) On April 28, 2022, PNC denied Decedent's claim for reimbursement, explaining that Decedent was unable to make a claim against PNC for unauthorized signatures or alterations

because more than thirty days had passed since PNC sent the first statement showing an unauthorized transaction by the same wrongdoer. (ECF No. 36-1 ¶ 56; ECF No. 1 at 36.)

### B.    Procedural History

On July 5, 2023, Decedent filed this action in the Court of Common Pleas of Chester County, Pennsylvania bringing claims for breach of express and implied contract, common law negligence, common law conversion, and conversion under the UCC. (ECF No. 1.) PNC subsequently removed the action to this Court. (*Id.*) On September 15, 2023, PNC filed a Motion to Dismiss these claims. (ECF No. 6.) On April 5, 2024, the Court granted the Motion to Dismiss in part, dismissing Decedent's claims for breach of implied contract, common law negligence, and common law conversion. (ECF No. 12.) On July 3, 2024, counsel for Decedent filed a Suggestion of Death (ECF No. 21) notifying the Court of Decedent's passing, as well as a Motion to Substitute Sanjiv Naidu, Administrator of Decedent's Estate, as Plaintiff in this action (ECF No. 22). The Court granted the motion. (ECF No. 24.) On March 18, 2025, PNC filed a Motion for Summary Judgment on the remaining claims of breach of express contract and UCC conversion pursuant to 13 Pa. C.S.A. § 3420. (ECF No. 29.) On June 18, 2025, with the Court's approval, PNC filed the instant Motion, which incorporates additional deposition testimony. (ECF No. 26.) On July 24, 2025, Plaintiff filed a Memorandum in Opposition to the Motion for Summary Judgment ("Opposition"). (ECF No. 38.) On August 7, 2025, PNC filed a Reply in Support of the Motion for Summary Judgment. (ECF No. 39.) The matter is now ripe for disposition.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome

of the suit, given the applicable substantive law, and a dispute is genuine if the evidence presented is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50 (internal citations omitted). If after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate. *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

## IV.    DISCUSSION

### A.    Breach of Contract

Plaintiff brings a breach of contract claim under Pennsylvania law.[5] (ECF No. 1 at 17.) Plaintiff alleges that (1) PNC breached the terms of the Account Agreement by making payment on the Forged Checks without Decedent's authorization and (2) PNC breached its contractual duty of good faith and failed to exercise ordinary care by paying the Forged Checks. (ECF No. 1 at 17;

---

[5] Under Pennsylvania law, "[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Neither party has disputed that the Account Agreement is a valid contract that applies to this dispute. Rather, the parties focus on the issue of whether Plaintiff's breach of contract claim is time-barred by the terms of the Account Agreement.

ECF No. 38 at 25–27.) PNC avers that Plaintiff's contract claims are time-barred under notice provisions in the Account Agreement and that it acted in good faith and exercised ordinary care in paying the Forged Checks. (ECF No. 36 at 4.)

Agreements between a bank and its customers are subject to the UCC. 13 Pa. C.S.A. § 4401 *et seq.* Under the UCC, a bank "may charge against the account of a customer an item that is properly payable from the account." *Id.* § 4401. An item is "properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank." *Id.* Parties may deviate from the statutory provisions by agreement, "but the parties to the agreement cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care." *Id.* § 4103(a).

### 1.    Plaintiff's breach of contract claim regarding the first seven Forged Checks is time-barred under the terms of the Account Agreement.

PNC argues that the breach of contract claim is time-barred by the notice requirements of Decedent's Account Agreement with PNC which required Decedent to review his monthly account statements and notify PNC of "an error or other irregularity, including unauthorized payment, within 30 calendar days of the mailing date of the earliest statement describing the charge." [6] (ECF No. 36 at 4; ECF No. 36-1 ¶¶ 21–22.) Banks may establish notice periods by contract. *See* 13 Pa. C.S.A. § 4103(a); *Env't. Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 721 (E.D. Pa. 2010) (acknowledging that a valid account agreement could shrink the one-year notice requirement established by default under § 4406 to a period of thirty days). Under the UCC, a bank that sends or makes available to customers an account statement must provide information in the

---

[6] While the amended Account Agreement clarified that notice was required within thirty calendar days of the "delivery date" rather than the "mailing date," there is no meaningful distinction between the terms under the definitions within the agreement. The amended Account Agreement elsewhere defines the term "deliver" to mean "mail or post." (ECF No. 29-4 at 8.)

statement "sufficient to allow the customer reasonably to identify the items paid." 13 Pa. C.S.A. § 4406(a). Sufficient information regarding a check paid entails the check number, amount, and date of payment. *Id.* After the bank provides the requisite account statement, the customer "must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." *Id.* at § 4406(c).

PNC mailed account statements to Decedent containing information sufficient to allow Decedent to identify the first seven Forged Checks. The May and June account statements contained the check numbers, amount paid, and date paid for each check at issue. (*See* ECF No. 29-5 at 3; ECF No. 29-6 at 3.) The first two Forged Checks—Paper Check Nos. 597 and 598—appeared on the May Account Statement that was mailed to Decedent on May 19, 2021. (ECF No. 36-1 ¶¶ 20, 33; ECF No. 29-5 at 3.) Therefore, accounting for weekend bank closures, Decedent was required to notify PNC of any issues with the May Account Statement by no later than June 21, 2021. (ECF No. 36 at 12.) The next five Forged Checks—electronic Check Nos. 7004 and 7005, and paper Check Nos. 521, 522, and 546—appeared on the June Account Statement that was mailed to Decedent on June 19, 2021. (ECF No. 36-1 ¶¶ 20, 33; ECF No. 29-6 at 3.) Decedent was required to notify PNC of any issues with the June Account Statement by no later than July 19, 2021. (ECF No. 36 at 12–13.) Yet Decedent did not provide notice to PNC regarding the Forged Checks on either statement until September 13, 2021 at the earliest, which was well beyond the thirty-day deadline. (ECF No. 36-1 ¶ 55; ECF No. 29-2 at 65:1–6.)

In response, Plaintiff contends that the thirty-day notice clock began to run only upon Decedent's actual receipt of the statements, rather than upon the mailing date specified in the Account Agreement. (ECF No. 38 at 12.) In support of this claim, Plaintiff refers to language in

the Account Agreement that directed Decedent to "review" his statement "[u]pon receipt," the text of the UCC requiring customers to "examin[e] the statement," and PNC's brief asserting that Decedent was required to report fraudulent activity within 30-days of "receiving" his account statement. (*Id.* at 12, 14.) Plaintiff concludes that the language in the Account Agreement "only makes sense if the '30-day clock' for a customer to review and report any irregularities begins upon actual receipt of any statement since one cannot review what one has not yet received." (*Id.* at 12.) Plaintiff also cites Ms. King's deposition testimony, wherein she stated that Ms. Zeigler changed delivery of Decedent's PNC statements from paper to online form, as evidence that Decedent did not actually receive the statements. (ECF No. 38 at 15.) Plaintiff asserts that because Decedent testified that he "d[id]n't recollect" or "d[id]n't know" whether he had received or reviewed the relevant account statements, actual receipt was not established and the thirty-day notice period could not have been triggered. (*Id.* at 15.)

The breach of contract claim is time-barred as to the first seven Forged Checks because the notice period was triggered on the mailing date of the relevant statement and Decedent's failure to notify PNC of the irregularities within that thirty-day period. By signing the Account Agreement, Decedent agreed to the notice period clearly defined in the Agreement, which required Decedent to report errors or irregularities in the account statements to PNC within thirty days of the mailing date. (ECF No. 29-3 at 9; ECF No. 29-4 at 9.) The Account Agreement also confirms that any written notice that PNC gives to the customer is effective when it is mailed to the customer at the address on file for their account. (ECF No. 29-3 at 12; ECF No. 29-4 at 13.) "Under Pennsylvania law, proof of mailing raises a rebuttable presumption that the mailed item was received." *Wachovia Bank, N.A.*, 741 F. Supp. 2d at 723 (quotation marks and citations omitted). Once the presumption is established, the party asserting that it did not receive the letter has the burden of proving such,

"and merely asserting that the letter was not received, without corroboration, is insufficient." *Id.* PNC has put forth undisputed evidence that the May and June Account Statements were mailed to Decedent in accordance with the bank's regular business practices. (ECF No. ¶¶ 19–20.) Decedent's deposition testimony that he did not recall or did not know if he had received those statements is not sufficient to overcome this fact. *Bracy v. Macy's Retail Holdings, Inc.*, 2020 WL 1953647, at *7 (E.D. Pa. Apr. 23, 2020) ("[A] plaintiff's lack of recollection does not create a genuine issue of disputed fact.").

Furthermore, Plaintiff's sole point of evidence in support of the claim that Decedent did not receive his account statements is Ms. King's testimony that "Ms. Zeigler changed delivery of the PNC statements from mail to online." (ECF No. 38, Ex. E ¶ 24(e).) The testimony does not indicate *when* Ms. Zeigler made those changes so as to support a finding that the account statements at issue were made unavailable to Decedent. Moreover, even if Decedent did not see those statements due to Ms. Zeigler's actions, the failure to review is still not the fault of PNC. *See Schwartz v. Bryn Mawr Trust Co.*, 1996 WL 479659, at *5 (E.D. Pa. Aug. 21, 1996) ("That [Decedent] did not see the statements, because [the employee] apparently diverted them to hide her embezzlement, cannot be charged to the bank.").

Moreover, the record demonstrates that Decedent was able to access and review his account statements when he saw fit. (*See* ECF No. 29-13 at 17 ("Naidu thought everything was running smoothly *until he began to look at his personal bank statements sometime in late August 2021*, when he noticed that he was missing tens of thousands of dollars . . . .") (emphasis added).) Indeed, Decedent's own testimony suggests that he typically chose not to review his statements—not that he was prevented from doing so. (*See* ECF No. 36-2 at 14:10–11 (Decedent confirming that he did

11

not ordinarily check his bank statements because he "ha[d] so many account businesses, so many businesses, [he] d[id]n't check all those things").)

### 2. The UCC's same wrongdoer rule bars Plaintiff's breach of contract claim for the remaining Forged Checks.

The UCC's same wrongdoer rule (the "Rule") applies if, after the bank sends or makes available a customer's account statement, the customer fails to meet his burden of promptly notifying the bank of any unauthorized signatures or altered items within thirty days. 13 Pa. C.S.A. § 4406(c)–(d). Under the Rule, a customer who fails to provide this notice is precluded from asserting claims related to unauthorized signatures or alterations by the same wrongdoer on any other item paid in good faith by the bank before notice is received. *Id.* § 4406(d). "If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply." *Id.* § 4406(e).

PNC argues that the Rule bars Plaintiff's breach of contract claims as to the remaining two Forged Checks. (ECF No. 36 at 14.) Plaintiff only briefly addresses PNC's assertion of the Rule in the context of the UCC conversion claim, not the breach of contract claim. (ECF No. 38 at 22.) Plaintiff asserts that the Rule does not apply because "there is a genuine issue of material fact concerning whether the '30-day' clock to review and report the unauthorized payments ever started since there is no evidence that Plaintiff actually received any monthly statements" prior to discovering the fraud. (*Id.*) As previously explained, the mailing date, rather than the actual receipt date, triggers the 30-day notice period. Plaintiff has not disputed that the statements were mailed to Decedent in the manner described in PNC's SUMF. (*See* ECF No. 36-1 ¶ 58.)

Ms. Zeigler first forged Decedent's signature on Check No. 597, which was paid on May 13, 2021, and appeared on the May Account Statement. (ECF No. 36-1 ¶¶ 19, 33, 58.) Ms. Zeigler subsequently forged every paper check at issue and was therefore the wrongdoer responsible for

unauthorized signatures on each of those checks. (ECF No. 36 at 16; ECF No. 36-1 ¶¶ 62, 72.) Under the Rule, Decedent was required to notify PNC of the disputed forgeries on the May Account Statement within thirty days of receiving the statement otherwise the claim would be precluded. PNC has submitted undisputed evidence that it mailed the May Account Statement on May 19, 2021, and that Decedent failed to notify PNC of any unauthorized transaction until September 13, 2021, nearly four months later. (ECF No. 36-1 ¶¶ 55, 58–59.) At that point, PNC had already made payment on every check forged by Ms. Zeigler. Thus, the Rule precludes Plaintiff from asserting claims related to the unauthorized signatures on paper Check Nos. 524 and 527, which appeared on the August Account Statement and September Account Statement, respectively. (ECF No. 36-1 ¶ 33.) The Rule therefore bars Plaintiff's breach of contract claims as to those two Forged Checks, Nos. 524 and 527, unless PNC did not make the payments in good faith.

### 3. PNC demonstrated that it acted in good faith and in accordance with reasonable commercial standards of ordinary care when it made payment on the Forged Checks.

An implied contractual duty of good faith is incorporated into the UCC. *See* 13 Pa. C.S.A. § 1304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement."). Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* § 1201(b)(20); *see also Reg'l Produce Coop. Corp. v. TD Bank, N.A.*, 645 F. Supp. 3d 394, 411 (E.D. Pa. 2022). Official comments to the UCC state that "[f]ailure to exercise ordinary care is to be determined in the context of all the facts relating to the bank's conduct with respect to the bank's collection of the check." *Id.* at 413 (citing UCC § 3-405, Official Comment 4). The UCC provisions governing bank deposits and collections emphasize that parties may not disclaim these responsibilities by agreement. 13 Pa. C.S.A. §

4103(a). The statute explicitly states that the same wrongdoer rule does not apply to preclude a plaintiff's claims if the customer proves that the bank did not pay the item at issue in good faith. 13 Pa. C.S.A. § 4406(d)–(e).

### a) *PNC did not act in bad faith in executing the Account Agreement.*

A bank must have acted with knowledge and/or malicious intent rather than mere negligence to constitute bad faith. *Reg'l Produce Coop. Corp.*, 645 F. Supp. 3d at 411 (citing *Pavex, Inc. v. York Fed. Savs. & Loan Ass'n*, 716 A.2d 640, 645 (Pa. Super. Ct. 1998)). Courts have declined to find bad faith where there is no evidence that the bank had notice or knowledge of the wrongdoing, there was any concerted action of the bank and the wrongdoer, the bank had any clear warning, or the bank or its officers personally benefited. *Id.* (citing *Estate of Clark ex rel. Clark v. Toronto Dominion Bank*, 2013 WL 1159014, at *9 (E.D. Pa. Mar. 21, 2013)).

PNC argues that it made payments on the Forged Checks in good faith because it had no knowledge regarding Ms. Zeigler's access to Decedent's account and it complied with its obligations under the Account Agreement by providing Decedent with monthly account statements sufficient to allow Decedent to identify the Forged Checks. (ECF No. 36 at 23–24.) Plaintiff fails to point to any knowledge or malicious intent on PNC's part that would require a finding of bad faith, any coordination between Ms. Zeigler or Ms. King and PNC in connection with the fraudulent activity, or any other factors tending toward bad faith. Accordingly, the Court finds that there is no genuine issue of material fact as to whether PNC acted in good faith when paying the Forged Checks.

> b)      *PNC has established facts sufficient to demonstrate that it followed reasonable commercial standards when paying the Forged Checks.*

Reasonable commercial standards "do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by" UCC Article 3 or 4. *Auto Sision, Inc. v. Wells Fargo*, 375 F. Supp. 3d 627, 631 (E.D. Pa. 2019) (citing 13 Pa. C.S.A. § 3103).

PNC maintains that it acted in accordance with reasonable commercial standards when it used an automatic system for taking and paying checks. (ECF No. 36-1 ¶ 24.) PNC admits that it does not conduct manual analysis of every check's signature to ensure that it is identical to that of the account holder. (*Id.* ¶ 25.) However, PNC asserts that this is consistent with both its own policies and modern banking practices. (ECF No. 36 at 25–26; ECF No. 36-1 ¶¶ 24–25); *see also Guardian Life Ins. Co. v. Weisman*, 223 F.3d 229, 233 (3d Cir. 2000) (explaining that under modern banking procedures "there is often no verification of signatures or at most random sampling for checks below a certain amount"). PNC explains that it relied on an automated system to review, process, and disburse funds to pay checks drawn on customer accounts. (ECF No. 29-17 ¶ 5.) PNC also notes that its ordinary and customary business practices do not include providing customers with notifications each time a new payee is identified on a check cashed against a customer's account. (*Id.* ¶ 7.) Indeed, the latter would likely result in an unwieldy number of notifications—both for PNC to send and customers to receive.

In the Opposition, Plaintiff first contends that Decedent "was entitled to a reasonable, good faith belief that PNC would diligently monitor his account and contact him about any irregularities." (ECF No. 38 at 25–26.) But Plaintiff's reliance on *Lichtenstein v. Kidder, Peabody & Co. Inc.*, 840 F. Supp. 374 (W.D. Pa. 1993), in support of this argument is improper. In that

case, the court determined that the defendant brokerage firm's express contractual obligations with the plaintiff informed the applicable care standard. *Lichtenstein*, 840 F. Supp. at 385. The agreement provided that the plaintiff's account would be maintained in accordance with the rules and regulations of the New York Stock Exchange and defendant's policy, which ultimately required that the defendant "[s]upervise diligently all accounts handled by registered representatives." *Id.* As a result, the court found that the reasonable commercial standard had not been met where the plaintiff's account representative failed to supervise the account and did not contact the plaintiff regarding various account abnormalities. *Id.* Here, Plaintiff fails to point to applicable policies that suggest that PNC alone would be responsible for ensuring that there were no irregularities with Decedent's account. Contrary to Plaintiff's assertions, the notice provisions in the Account Agreement seem to follow the UCC's general framework which "seeks to discourage fraud by allocating losses to the party whose negligence allowed the scheme to succeed or was in the best position to prevent its occurrence." *See Menichini v. Grant*, 995 F.2d 1224, 1234 (3d Cir. 1993). Plaintiff may not now pass off Decedent's responsibility to prevent fraudulent transactions, particularly when Decedent's own testimony indicates that it was his disinterest, rather than mental infirmity or age, that led him to avoid reviewing the statements that he received. (*See* ECF No. 36-2 at 14:10–11.)

Second, Plaintiff argues that PNC fails to adduce any evidence that it engaged in spot checking of signatures on the checks at issue. (ECF No. 38 at 26.) However, Plaintiff identifies no evidence indicating that a commercially reasonable standard requires PNC to "spot check" signatures or checks, nor that PNC did not engage in such procedures. PNC submitted undisputed facts that it relies on an automated system to review, process, and disburse funds to pay checks. (ECF No. 36-1 ¶¶ 24–25.) There is no evidence to suggest that this system does not include spot

checking. Furthermore, for the electronic checks, which lack signatures, PNC has submitted that it confirms authorization for the check submissions through the customer's online PNC Account portal. (ECF No. 36-1 ¶ 36.) Plaintiff fails to present evidence indicating that this process is not in accordance with commercially reasonable standards.

Given the above, Plaintiff has failed to create a genuine issue of material fact as to whether PNC acted in bad faith and not in accordance with commercially reasonable standards of care when paying the Forged Checks. Plaintiff's claim for breach of the implied contractual duty of good faith therefore fails.[7]

### 4.    Plaintiff has not demonstrated that the Account Agreements are contracts of adhesion.

In opposition to the Motion, Plaintiff asserts that the Account Agreement is a contract of adhesion under 42 Pa. C.S.A. § 7321.7 that is both procedurally and substantively unconscionable. (ECF No. 38 at 10–13.) Plaintiff does not state whether he seeks to invalidate the entirety of the Account Agreement or only certain provisions within it.

The doctrine of unconscionability provides an affirmative defense to an adhesion contract's enforcement. *Centric Bank v. Sciore*, 348 A.3d 1089, 1102 (Pa. Super. Ct. 2025) (citation omitted). An adhesion contract is a "standard-form contract prepared by one party, to be signed by another party in a weaker position, [usually] a consumer, who must essentially either accede (adhere) to the terms or not have a contract at all." Black's Law Dictionary (12th ed. 2024). "Once a contract is deemed to be one of adhesion, its terms must be analyzed to determine whether the contract as a whole, or specific provisions of it, are unconscionable." *Denlinger Inc. v. Dendler*, 608 A.2d

---

[7] For the same reasons stated in this section, the Court's determination that the same wrongdoer rule is applicable under 13 Pa. C.S.A. § 4406(e), which may only be asserted by a party acting in good faith, is unaffected.

1061, 1067 (Pa. Super. Ct. 1992). Under Pennsylvania law, unconscionability requires that (1) "the party signing the contract must have lacked a meaningful choice in accepting the challenged provision" and (2) "the challenged provision must 'unreasonably favor' the party asserting it." *Id.* at 1068. The party challenging the contract or provision bears the burden of affirmatively pleading and proving unconscionability, and the court makes the ultimate determination of unconscionability. *Id.* at 1067.

Plaintiff has made only a conclusory statement that the Account Agreements are unconscionable contracts of adhesion: "PNC's standard account agreement is both procedurally and substantively unconscionable. It is substantively unconscionable because it unreasonably favors PNC, the drafting party. It is procedurally unconscionable because Dr. Naidu had no choice but to sign it and could not negotiate its terms." Plaintiff offers no support for this argument beyond a factual assertion without citation to record evidence. (ECF No. 38, Ex. E ¶ 13.) In response, PNC argues that if the Account Agreement as a whole is a contract of adhesion, the Court would need to dismiss Plaintiff's breach of contract claim. (ECF No. 39 at 10.) Moreover, PNC asserts that the thirty-day notice provision in the Account Agreement is not unconscionable. (*Id.*)

The Court identifies no procedural or substantive unconscionability that warrants voiding the notice provisions of the Account Agreement. There is no evidence to suggest that Decedent lacked other banking options such that he was effectively forced to enter into an agreement with PNC, nor that he tried but was unable to negotiate the terms of the agreement. Moreover, as other courts have recognized, a shortened notice period for a customer to raise issues identified in bank account statements does not unreasonably favor the bank. *See Wachovia Bank, N.A.*, 741 F. Supp. 2d at 725 n.19 (opining that "there is nothing particularly unconscionable about a bank contractually decreasing the notification time limit from one year to 30 or 40 days"); James J.

18

White et al., *Uniform Commercial Code* 817 (7th Ed. 2022) (collecting various state cases reflecting "courts' consistent willingness to allow banks to restrict the customer's time to give notice of errors in the monthly statement"). As such, Plaintiff's unconscionability argument fails.

### B.    UCC Conversion – 13 Pa. C.S.A. § 3420 (Count III)

Plaintiff brings a claim pursuant to UCC 13 Pa. C.S.A. § 3420(a), alleging that PNC is liable for conversion for making payments on the Forged Checks without Decedent's knowledge or permission. (ECF No. 1 at 19.) Under the UCC, an instrument is converted if "a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the payment or receive payment." 13 Pa. C.S.A. § 3420(a). An action under § 3420(a) may not be brought by the issuer or acceptor of the instrument. *Id.* An "issuer" is the "maker or drawer of an instrument" and a "drawer" is "[a] person who signs or is identified in a draft as a person ordering payment." *Id.* § 3103(a). Comments to the UCC emphasize that a drawer should not have an action in conversion given that the drawer "has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check." *Reg'l Produce Coop. Corp.*, 645 F. Supp. 3d at 427.

### 1.    UCC § 3420 does not allow for Plaintiff's claims regarding the two electronic Forged Checks.

Article 3 of the UCC, as adopted under Pennsylvania law, governs only negotiable instruments, which is "limited to a *signed writing* that orders or promises payment of money." *Binns v. Truist Bank*, 803 F. App'x 618, 621 (3d Cir. 2020) (emphasis in original) (citing 13 Pa. C.S.A. § 3104); *see also Hospicomm, Inc. v. Fleet Bank, N.A.*, 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004) ("Pennsylvania's adoption of Article 4 does not contemplate electronic withdrawals"). Meanwhile, the Electronic Fund Transfer Act ("EFTA") governs "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an

electronic terminal, telephonic instrument, or computer or magnetic tape." 15 U.S.C. § 1693a(7); *see also Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 207 n.7 (1st Cir. 2012) (explaining that consumer payments that are made electronically, such as through direct wiring, are covered by the EFTA).

The UCC does not allow Plaintiff to bring claims under § 3420 for the two electronic checks (check Nos. 7004 and 7005) at issue. The electronic checks were submitted through Decedent's online PNC Account portal and do not contain signatures. (ECF No. 36-1 ¶¶ 34–35.) As such, they cannot be considered negotiable instruments giving rise to a claim under these provisions of the UCC. Instead, claims related to these payments are governed by the EFTA. *See Binns*, 803 F. App'x at 621–22. While Plaintiff did not plead claims under the EFTA, PNC presented arguments on summary judgment that the two electronic Forged Checks are not "unauthorized electronic fund transfer(s)" for which Plaintiff may recover losses under the EFTA or, in the alternative, that the EFTA claims are time-barred. (ECF No. 36 27–30.) Plaintiff did not address these arguments in their Opposition, so Plaintiff is deemed to have waived any opposition to them. *McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 193 (E.D. Pa. 2022) ("District courts in the Third Circuit have held that when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of those issues.") (citation modified). Accordingly, the UCC conversion claims are dismissed as to the two electronic Forged Checks.

**2.     Plaintiff's claim regarding the paper Forged Checks is barred as a matter of law.**

PNC asserts that Plaintiff's conversion claim is barred as a matter of law because Decedent was the issuer of the Forged Checks. (ECF No. 36 at 10–11.) In response, Plaintiff argues that the

Court should reject PNC's summary judgment motion as to the UCC conversion claim because it already considered and rejected PNC's request to dismiss the claim upon motion to dismiss. Plaintiff also contends that when a forged check is written on a customer's account by a third party, the unauthorized third party becomes the issuer. (ECF No. 38 at 20.) Plaintiff maintains that "[t]his is just common sense and consistent with a plain English reading of the statutory language." (*Id.*)

As an initial matter, the Court notes that the standard applied on a motion to dismiss is fundamentally different than on a motion for summary judgment. Plaintiff's suggestion that the Court already decided this issue is therefore incorrect. (*See* ECF No. 38 at 19.) More to the point, courts have repeatedly found that persons or entities appearing on checks as the person ordering payment (the drawer) are barred from asserting conversion claims under § 3420. *See, e.g.*, *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 781–82 (E.D. Pa. 2008) (dismissing § 3420 claim where employee had altered and cashed checks bearing the name of the business without authorization); *Sebastian v. D & S Exp., Inc.*, 61 F. Supp. 2d 386, 390 (D.N.J. 1999) (rejecting claim under § 3420 where agent of the issuer signed the check bearing issuer's name at the top of the check); *Alan's Auto Ctr. v. King Check Cashing, Inc.*, 2010 Phila. Ct. Com. Pl. LEXIS 223, at *5–6 (Phila. Ct. Cm. Pl. Aug. 24, 2010) ("[Plaintiff] was the drawer and the issuer. The signature on the company check identified a company principal as the 'person ordering payment,' despite the fact that the signature was forged."). Here, Decedent is identified on the checks at issue as the person ordering payment from his PNC Account, which makes him the drawer and issuer of the checks. Plaintiff is therefore barred from bringing a § 3420 claim in Decedent's name.

Because the Court holds that Plaintiff's claims under UCC § 3420 are barred under the statute, it does not assess Defendant's argument that Plaintiff's claims regarding some of the Forged Checks are otherwise time-barred under the same wrongdoer rule.

## V.      CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted as to all claims. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**